UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-20777-CIV-LENARD/O'SULLIVAN

WILLIAM M. COHEN, D.M.D.,
M.S., GREATER ST. LOUIS
PERIODONTICS, P.C.,
individually and on behalf of all others
similarly situated,

       Plaintiff,

v.

IMPLANT INNOVATIONS, INC., d/b/a
"3i",

       Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on Plaintiff's Motion for Class Certification (DE# 60, 12/07/07). On March 5, 2008, this matter was referred to the undersigned by the Honorable Joan A. Leonard, United States District Court Judge for the Southern District of Florida (DE# 96). Having held a hearing on April 18, 2008 and having carefully considered the instant motion, the exhibits, court file and applicable law, the undersigned respectfully recommends that Plaintiff's Motion for Class Certification (DE# 60, 12/07/07) be **DENIED**.

## BACKGROUND

"Defendant 3i designed, manufactured, marketed, distributed, and sold a permanent endosseous dental implant, known as the Osseotite NT CERTAIN Implant and related system components including customized shaping drills [hereinafter 'Implant Product']." See Complaint (DE# 93 at ¶ 7, 2/27/08).  On March 23, 2007, the

plaintiff[1] filed a complaint alleging claims for breach of express and implied warranties (Counts I and II) and a claim under Florida's Deceptive and Unfair Trade Practices Act (hereinafter "FDUTPA") (Count III) arising from the sale of the Implant Product. See Complaint (DE# 93, 2/27/08).

The plaintiff filed the instant motion, Plaintiff's Motion for Class Certification (DE# 60), on December 7, 2007. The defendant filed Biomet's Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification (DE# 77) on January 14, 2008. The plaintiff filed a reply memorandum on February 5, 2008. See Plaintiff's Reply Memorandum in Support of Motion for Class Certification (DE # 88, 2/5/08).[2] The undersigned permitted the plaintiff to file its Supplemental Memorandum of Law in Support of Plaintiff's Motion for Class Certification (DE# 99, 3/12/08) and the defendant to file Defendant Biomet 3i, Inc.'s Response to Plaintiffs' Supplemental Memorandum of Law in Support of its Motion for Class Certification (DE# 102, 3/19/08). On April 17, 2008, the defendant filed Defendant's Notice of Filing Supplemental Authority in Support of Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification. Following the parties' extensive briefing of the issues, the undersigned heard oral argument concerning the instant motion on April 18, 2008.

---

[1] The initial complaint identified the plaintiff as Greater St. Louis Periodontics, P.C. On February 22, 2008, the Court granted the plaintiff leave to amend the Complaint by interlineation to reflect the plaintiff's true corporate name: William M. Cohen, D.M.D., M.S., Greater St. Louis Periodontics, P.C. See Order (DE# 92, 2/22/08).

[2] The plaintiff's initial reply (DE# 80, 1/28/08) was stricken by the Court because it "exceed[ed] the page limitation set forth in the local rules . . . and appear[ed] to improperly raise new arguments therein." See Order (DE# 86, 1/31/08).

## ANALYSIS

Federal Rule of Civil Procedure 23 establishes the requirements for certifying a class action in federal court.  District courts must conduct a "rigorous analysis" of Rule 23 class certification requirements. Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982).  In doing so, the Court must accept as true the factual allegations of the complaint and determine only whether those allegations meet the requirements of Rule 23. Hammett v. Am. Bankers Ins. Co., 203 F.R.D. 690, 693 (S.D. Fla. 2001).  While the Court is not to conduct a preliminary inquiry into the merits of a case at this stage, the Court "may look beyond the allegations of the complaint in assessing whether a motion for class certification should be granted." Id. (citing Gen. Tel. Co. of Sw., 457 U.S. at 160 (1982)).

In order to certify a class action in federal court, the plaintiff bears the burden of demonstrating that the proposed class satisfies the prerequisites of Rule 23(a) and at least one of the alternative requirements of Rule 23(b). Piazza v. Ebsco Indus., Inc., 273 F.3d 1341, 1351-52 (11th Cir.  2001). Rule 23(a) provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Id. The Rule 23(a) requirements are commonly referred to as numerosity, commonality, typicality and adequacy.

If all of the prerequisites of Rule 23(a) are met, then the Court must evaluate whether at least one of the three provisions of Rule 23(b) apply. In the instant case, the

3

plaintiff seeks class certification under Rule 23(b)(3). A class action under Rule 23(b)(3) is sustainable when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**1.      Adequacy of Class Definition**

At the outset, the undersigned will determine whether the plaintiff has adequately defined the class. "Before analyzing the Rule 23(a) requirements, or as part of the numerosity inquiry, a court must determine whether the class definition is adequate." O'Neill v. Home Depot U.S.A., Inc., 243 F.R.D. 469, 477 (S.D. Fla. 2006) (citation omitted). "A court should deny class certification where the class definitions are overly broad, amorphous, and vague, or where the number of individualized determinations required to determine class membership becomes too administratively difficult." Perez v. Metabolife Int'l., Inc., 218 F.R.D. 262, 269 (S.D. Fla. 2003).

With respect to its breach of implied warranty and FDUTPA claims, the plaintiff seeks class certification on behalf of "all periodontists, oral surgeons, and similar medical-dental professionals (or, as applicable, their professional corporations or other corporate entities) who purchased the Implant Product in the United States and have had to replace the Implant Product at a rate higher than warrantied." See Complaint (DE# 93 at ¶ 11, 2/27/08).[3]

---

[3] The defendant argues that the plaintiff has inconsistently defined its proposed class. Although there is some variation in the class definitions contained in the Complaint (DE# 93, 2/27/08), the Plaintiff's Motion for Class Certification (DE# 60, 12/7/07) and the plaintiff's Memorandum of Law in Support of Plaintiffs' Motion for

The plaintiff also seeks to certify a breach of express warranty class consisting

of:

> all periodontists, oral surgeons, and similar medical-dental professionals
> (or, as applicable, their professional corporations or other corporate
> entities) in Alabama, Connecticut, Delaware, District of Columbia, Florida,
> Hawaii, Idaho, Indiana, Kansas, Louisiana, Maryland, Massachusetts,
> Michigan, Missouri, Montana, New York, North Carolina, North Dakota,
> Pennsylvania, South Carolina, South Dakota,[4] Vermont, Virginia and West
> Virginia who purchased the Implant Product in the United states, received
> marketing materials about Implant Product's success rate, and have had
> to replace the Implant Product at a rate higher than warrantied within the
> applicable statute of limitations.

See Plaintiff's Reply Memorandum in Support of Motion for Class Certification (DE# 88

at 8-9, 2/5/08). The express warranty class is limited to the District of Columbia and

those states which, according to the plaintiff, do not require reliance as an element of a

breach of express warranty claim. At oral argument, the plaintiff proposed the following

modification: all periodontists, oral surgeons, and similar medical-dental professionals

who had experienced a failure rate in excess of their normal rate and whose failure was

higher than warrantied by the defendants.

The defendant argues that the plaintiff's class definitions are defective because

they "require[ ] a finding that a class member 'had to replace the Implant Product at a

rate higher than warrantied' just to identify who is in the class." See Biomet's

Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification (DE# 77

---

Class Certification (DE# 61, 12/7/07), in its reply, the "[p]laintiff [clarified] that any
alleged inconsistency in its proposed class definitions [would be] remedied by [using]
the [class definition] in its complaint." See Plaintiffs' Reply Memorandum in Support of
Motion for Class Certification (DE# 88 at 6, 2/5/08).

[4] The defendant's discovery responses show that the Implant Product was not
sold in South Dakota.

at 18, 1/14/08). "[T]his determination will require individualized mini-trials of each putative class member." Id.

The undersigned agrees with the defendant. In order to determine who is a member of the putative class, the Court would first have to make a legal determination on the defendant's warrantied rate of failure. This will require the Court to decide whether the marketing materials prepared by the defendant constitute an express warranty pursuant to the applicable law[5] and then determine that each putative class member experienced a failure rate that was higher than warrantied by the defendant. Notably, under the plaintiff's class definition, an individual who purchased a single Implant Product and unsuccessfully implanted that product would be included in the class (regardless of the reason for the implant failure) because he or she experienced a 100% failure rate and would have had to replace the product at a higher rate that warrantied.

The "normal failure rate" modification proposed at oral argument creates further problems in identifying the class. It requires that the Court make factual determinations as to each individual putative class member's "normal failure rate." The plaintiff does not explain how this would be a workable class definition. To determine the normal failure rate, would each putative class member look through patient records to determine (a) the number of implant procedures performed and (b) the number of patients whose implants failed? Presumably, some medical records, particularly older records, are no longer available. The plaintiff does not place a limit on the time frame

---

[5] The undersigned will address conflict of law issues in section 2(C) and 3(A)(i) of this Report and Recommendation.

6

for determining a putative class member's normal rate of failure. Is the normal rate of failure determined by the number of implants performed in the past year, the past five years, or the putative class member's total years of practice? Once a putative class member determines the number of failures he or she has experienced, would that putative class member then discount those failures which occurred due to improper implantation or misuse of the product by the patient? The plaintiff's proposed modification presents problems in identifying the class and would require individualized hearings. See Perez v. Metabolife Int'l., Inc., 218 F.R.D. 262, 266 (S.D. Fla. 2003) (rejecting class definition which "require[d] individualized determinations as to who [were] class members.").

Without an adequately defined and clearly ascertainable class, the Court cannot grant class certification. Perez, 218 F.R.D. at 266-67. "An identifiable class is essential so that the Court can determine whether a particular claimant is a class member." Perez, 218 F.R.D. at 266 (internal citation omitted). Nonetheless, because deficient class definitions can be modified, the undersigned will address the requirements of Rule 23(a) and 23(b)(3) to determine whether the plaintiff would otherwise be entitled to class certification.

**2.      Rule 23(a) Requirements**

      **A.      Numerosity**

Under Rule 23(a)(1), the class must be so numerous that joinder is impracticable.  In order for joinder to be impracticable, it need not be impossible but simply difficult or inconvenient. Pecere v. Empire Blue Cross and Blue Shield, 194

F.R.D. 66, 70 (S.D. N.Y. 2000) (citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1762 (2d ed. 1986)).  Practicability of joinder depends on many factors: the size of the class, the ease of identifying its numbers and determining their addresses, facility of making service on them if joined, and their geographic dispersion.  Hammett,  203 F.R.D. at 694; see also Kilgo v. Bowman Transp., Inc., 789 F.2d 859, 878 (11th Cir. 1986).  The plaintiff argues that it has satisfied the numerosity requirement because "3i has sold more than 126,000 units to more than 2,000 customers" in all 50 states.[6] See Plaintiff's Supplemental Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (DE# 99 at 2, 3/12/08).

Here, "[the defendant] does not contest numerosity on the ground that the proposed class is too small; it . . . argues . . . that the proposed class is not adequately defined or clearly ascertainable given Plaintiff's inconsistent and defective class definitions." See Defendant Biomet 3i, Inc.'s Response to Plaintiffs' Supplemental Memorandum of Law in Support of its Motion for Class Certification (DE# 102 at 1-2, 3/19/08). The undersigned addressed the defendant's class definition concerns above. Assuming, arguendo, that the proposed class definitions are adequate, the plaintiff easily satisfies the numerosity requirement. The large number of Implant Products sold by the defendant and the geographic dispersion of the putative class members make joinder impracticable in the instant case.

---

[6] According to the defendant's discovery responses, the Implant Product was sold in 49 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. See Defendant Biomet 3i, Inc.'s Response to Plaintiff's Supplemental Memorandum of Law in Support of its Motion for Class Certification (DE# 102 at 2, 3/19/08).

## B.    Commonality

Commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the representative plaintiff in relation to the class. Prado-Steinman v. Bush, 221 F.3d 1266, 1279 (11th Cir. 2000).  The commonality requirement demands that a class action involve issues susceptible to class-wide proof.  Cooper v. Southern Co., 390 F.3d 695, 714 (11th Cir. 2004).

The plaintiff argues that it "meets the commonality requirement because the breach of warranty and Florida consumer fraud claims all share as a common issue - that Defendant affirmatively represented that the failure rate for the Implant Product was less than two percent (2%)" and "Defendant never informed [the putative class] that the representations were not true and that the failure rate was actually much higher." See Memorandum of Law In Support of Plaintiff's Motion for Class Certification (DE# 61 at 7-8, 12/7/07).[7]

"[T]he threshold for commonality is not high . . . . [and f]actual differences between class members do not necessarily preclude a finding of commonality." Clausnitzer v. Fed. Express Corp., 248 F.R.D. 647, 656 (S.D. Fla. 2008) (quoting Leszczynski v. Allianz, Inc., 176 F.R.D. 659, 671 (S.D. Fla. 1997)).  "The requirement is met if the questions linking the class members are substantially related to the resolution of the litigation even though the individuals are not identically situated." Clausnitzer, 248 F.R.D. at 656 (quoting Collins v. Int'l Dairy Queen, Inc., 168 F.R.D. 668, 673-74 (M.D.

---

[7] The defendant does not dispute that commonality is satisfied in the instant case. See Biomet's Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (DE# 77 at 7, n 3, 1/14/08).

Ga. 1996)). In light of the low threshold of commonality, the plaintiff has satisfied the commonality requirement in the instant case.

### C.    Typicality

Typicality requires that the representative plaintiff's claims or defenses be typical of the claims or defenses of the class.  "In other words, typicality requires a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class." Hammett v. Am. Bankers Ins. Co., 203 F.R.D. 690, 694 (S.D. Fla. 2001). The representative's claims are typical if they arise from the same pattern or practice and are based on the same legal theory as those of the proposed class members. A factual variation in claims will not render a representative's claims atypical unless such variation results in markedly differentiating the representative's factual position from that of the proposed class members. Id.

The plaintiff argues that it meets the typicality requirement because:

Plaintiff and the [putative] Class Members all purchased the Implant Product with the representation from the Defendant and under the belief that the product's failure rate was less than two percent (2%). As a result of the actual, much higher failure rate, Plaintiff, and the putative Class Members sustained financial loss.

See Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (DE# 61 at 10, 12/7/07). The defendant argues that the plaintiff cannot meet the typicality and adequacy[8] requirements because the plaintiff lacks standing to bring its breach of implied warranty claim and its FDUTPA claim. See Biomet's Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification (DE# 77 at 19-20, 1/14/08).

---

[8] Adequacy is addressed in section 2(D) of this Report and Recommendation.

10

### i.    Warranty Claims

According to the defendant, the plaintiff lacks standing to bring its breach of implied warranty claim because "an essential requirement of an implied warranty claim in Florida is privity of contract between the plaintiff and defendant." See Biomet's Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification (DE# 77 at 19, 1/14/08). The defendant maintains that the plaintiff did not purchase the Implant Product from the defendant. Rather, the Implant Product was purchased by William M. Cohen (hereinafter "Dr. Cohen").[9] "Because [the] plaintiff is not in privity with [the defendant], it is subject to a unique defense that destroys a finding of typicality and adequacy." Id. at 20.The defendant does not challenge typicality with respect to the breach of express warranty claim. The undersigned finds that the plaintiff has satisfied the typicality requirement as to its breach of express warranty claim.

The plaintiff argues that William M. Cohen, D.M.D., M.S., Greater St. Louis Periodontics, P.C. and not Dr. Cohen, purchased the Implant Product. See Plaintiff's Reply Memorandum in Support of Motion for Class Certification (DE# 88 at 1, 2/5/08). Thus, the plaintiff is in privity with the defendant and not subject to a unique defense. The plaintiff submits the Supplemental Affidavit of William M. Cohen wherein Dr. Cohen attests that his company purchased 61 NT Certain implants from 3i. See Supplemental Affidavit of William M. Cohen (DE# 88 at Exhibit 1, 2/5/08). In light of Dr. Cohen's affidavit, the undersigned finds that the plaintiff is in privity with the defendant and has

---

[9] Dr. Cohen is the sole shareholder and president of William M. Cohen, D.M.D., M.S., Greater St. Louis Periodontics, P.C. See Affidavit of William M. Cohen (DE# 65 at Exhibit 1, 12/10/07).

satisfied the typicality requirement as to its breach of implied warranty claim.

### ii.    FDUTPA

The defendant also argues that the plaintiff lacks standing to bring a FDUTPA claim because the state with the most significant relationship to the plaintiff's claim is Missouri, not Florida. See Biomet's Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification (DE# 77 at 20, 1/14/08). The plaintiff argues that the application of Florida law to the entire class would not be arbitrary and unfair because the defendant is a Florida corporation and "virtually all of the corporate acts implicated by each claim occurred in Florida." See Memorandum of Law in Support of Plaintiff's Motion for Class Certification (DE# 61 at 14, 12/7/08).

Prior to engaging in a conflict of law analysis, the undersigned must first determine if there are true conflicts between FDUTPA and the unfair trade practice laws of the other 48 states[10] and the District of Columbia. "A comprehensive conflict-of-law analysis is only required if the case involves a true conflict." Pycsa Panama S.A. v. Tensar Earth Technologies, Inc., No. 06-20624, 2008 WL 1775409, at *15 (S.D. Fla. Apr. 16, 2008) (citing Tune v. Phillip Morris, Inc., 766 So. 2d 350, 352 (Fla. 2d DCA 2000)); see also Del Monte Fresh Produce Co. v. Dole Food Co., Inc., 148 F. Supp. 2d 1326, 1334 (S.D. Fla. 2001) (noting that it was not necessary to consider whether California law or Florida law applied because there was no true conflict between the two states' laws as they related to a specific legal claim). "[A] true conflict exists when 'two

---

[10] It does not appear that the defendant sold the Implant Product to any customers in South Dakota. See Exhibit A to plaintiff's Supplemental Memorandum of Law in Support of Plaintiff's Motion for Class Certification (DE# 99, 3/12/08).

or more states have a legitimate interest in a particular set of facts in litigation and the laws of those states differ or would produce a different result.'" <u>Pycsa</u>, 2008 WL 1775409, at *15 (citing <u>Walker v. Paradise Grand Hotel, Ltd.</u>, No. 01-3564, 2003 WL 21361662, at *5 (S.D. Fla. Apr. 25, 2003)).

The plaintiff argues that no substantial differences exist between FDUTPA and the unfair trade practice laws of other states. "Most state consumer protection statutes . . . are based on a model act promulgated by the Federal Trade Commission ("FTC") and the National Center of Commissioners on Uniform State Laws ("Uniform State Law Commission"). This model attempted to ensure a uniform means of protecting consumers from deceptive unfair trade or marketing practices." <u>See</u> Plaintiff's Reply Memorandum in Support of Motion for Class Certification (DE# 88 at 2, 2/5/08). In <u>Montgomery v. New Piper Aircraft, Inc.</u>, 209 F.R.D. 221, 229 (S.D. Fla. 2002), this Court rejected the plaintiff's argument when it declined to certify a nationwide class action based on FDUTPA. The Court in <u>Montgomery</u> noted that "[w]hile some deceptive trade practices laws stem from common sources, they are not uniform. The result is a patchwork of rules and standards reflecting the diverse policy judgments of lawmakers in fifty states." <u>Id.</u> at 229.

In the instant case, the defendant has identified numerous, concrete differences between the various unfair trade practice laws. For example: (1) some states have no private cause of action under their consumer protection laws or limit the right to a private action; (2) other states prohibit or restrict class actions; (3) some states require willful conduct while others do not require intent; (4) some states require a showing of reliance on the alleged deception and (5) in some states the action is limited to natural

13

persons, while others allow businesses to sue. <u>See</u> Biomet's Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification (DE# 77 at 9-10, 1/14/08). The undersigned agrees with the defendant that there are true conflicts between FDUTPA and the comparable laws of the other states and the District of Columbia.

Specifically, with respect to Missouri, the undersigned finds that there is a true conflict between FDUTPA and Missouri's unfair trade practice statute, the Missouri Merchandising Practices Act,  Mo. Rev. Stat. § 407.010 <u>et seq.</u>, (hereinafter "MMPA"). FDUTPA is not limited to consumer transactions.

> With the deletion of consumer transaction from FDUTPA, it would seem that such business entity consumers could sue for damages from outlawed acts and practices in ordinary business transactions without regard to whether the claimant was acting in the capacity of consuming goods or services. At least, nothing in section 501.211(2) purports to state otherwise.

<u>Beacon Prop. Mgmt., Inc. v. PNR, Inc.</u>, 890 So. 2d 274, 278 (Fla. 4th DCA 2004) (emphasis in original). "The MMPA . . . creates a private right of action, whereby '[a]ny person who purchases or leases merchandise primarily for personal, family or household purposes' may file suit if he is harmed by the acts set forth in Section 407.020." <u>In re Express Scripts, Inc., Pharmacy Benefits Mgmt. Litig.</u>, MDL No. 1672, 2006 WL 2632328, at *10 (E.D. Mo. Sept. 13, 2006) (citing Mo. Rev. Stat. § 407.025.1). Section 407.020 states, in part, as follows:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice.

Mo Rev. Stat. § 407.020(1). At least one court applying Missouri law found that the plain language of the MMPA did not allow a consumer to sue under the MMPA where the consumer purchased services for a business purpose. Id. In the instant case, while the plaintiff may have a claim under FDUTPA, it may not have a cognizable claim under the MMPA because the plaintiff purchased the Implant Product for a business purpose.[11] Because both Missouri and Florida have a legitimate interest in the plaintiff's unfair trade practice claim and applying the law of these states would yield different results, a true conflict exists.

Having determined that a true conflict exists between FDUTPA and the laws of other states, the undersigned will apply Florida's conflict of laws rules to determine whether Florida law would apply to the unfair trade practice claims of every putative class member. In a diversity action, a district court will apply the conflict of laws rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Florida utilizes the "most significant relationship" test of the Restatement (Second) of Conflict of Laws § 145 (1971) to determine which state's laws apply to tort claims, including FDUTPA. Green Leaf Nursery v. E.I. DuPont De Nemours and Co., 341 F.3d 1292, 1301 (11th Cir. 2003), cert. denied, 541 U.S. 1037 (2004); Montgomery v. New Piper Aircraft, Inc., 209 F.R.D. 221, 225 (S.D. Fla. 2002) (applying the most significant relationships test to FDUTPA claim). Section 145 states as follows:

(1) The rights and liabilities of the parties with respect to an issue in tort

_____

[11] The undersigned is not making a legal determination as to the viability of the plaintiff's claim under Missouri law. Rather, the undersigned uses this example to illustrate how there are true conflicts between FDUTPA and the laws of other states including Missouri.

are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145 (1971).

Thus, in determining which state has the most significant relationship to the plaintiff's unfair trade practice claim, the Court must consider the foregoing factors set forth in section 145(2). The Restatement advises that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." Grupo Televisa, S.A . v. Telemundo Communications Group, Inc., 485 F.3d 1233, 1240 (11th Cir. 2007) (citing Restatement (Second) of Conflict of Laws § 145).

The first contact is the place where the injury occurred. The Florida Supreme Court has observed that "[t]he state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law." Bishop v. Fla. Specialty Paint Co., 389 So. 2d 999, 1001 (Fla. 1980). The comments to section 145 explain that:

[i]n the case of personal injuries or of injuries to tangible things, the place where the injury occurred is a contact that, as to most issues, plays an important role in the selection of the state of the applicable law. . . . [because] persons who cause injury in a state should not ordinarily

16

escape liabilities imposed by the local law of that state on account of the
injury.

Restatement (Second) of Conflict of Laws § 145 cmt. e (1971). However, "the place of

injury is less significant in the case of fraudulent misrepresentations" than "in the case

of personal injuries and of injuries to tangible things" or cases of false imprisonment

and malicious prosecution. Id. § 145 cmt. f. Here, the parties agree that the injury took

place in the different states where the Implant Product was implanted and failed at a

higher rate than warrantied. Thus, the injury occurred in 49 states and the District of

Columbia. With respect to the plaintiff, the injury occurred in Missouri. The plaintiff's

FDUTPA claim is based on the sale of an unmerchantable good (the Implant Product)

and alleged misrepresentations made by the defendant about the failure rate of the

Implant Product. See Complaint (DE# 93 at ¶¶ 32-33, 2/27/08). Thus, the place of injury

is not as significant in the instant case as it would be in a personal injury case and the

undersigned will not assign significant weight to the first contact.

The second contact looks to the place where the conduct causing the injury

occurred. Here, most of the components of the Implant Product were designed and

manufactured in Florida with the exception of the shaping drills[12] which were

manufactured in Switzerland. The marketing materials containing the alleged

---

[12] The shaping drills are important to the successful implantation of the
defendant's product. "The implants incorporate a post that is cemented into a socket
drilled into the jaw using customized shaping drills. . . . The closeness of the fit between
the post and the socket is a function of, among other factors, the customized shaping
drills packaged as part of the Implant Product. If the shaping drills do not work properly,
the socket will not closely match the post, thus leading to voids or gaps between the
post and the jaw once the implant is placed. See Complaint (DE# 93 at ¶¶ 8-9,
2/27/08).

17

misrepresentations were presumably based in Florida[13] and the plaintiff received the offending marketing materials in Missouri.[14] Thus, the conduct causing the injury occurred in both Florida and Missouri.

The third contact examines the domicile, residence, nationality, place of incorporation and place of business of the parties. Here, this contact is neutral. The plaintiff is a Missouri corporation with its principal place of business in Missouri and the defendant is a Florida corporation with its principal place of business in Florida. See Complaint (DE# 93 at ¶¶ 1-2).

The last contact is the place where the relationship, if any, between the parties is centered. "When there is a relationship between the plaintiff and the defendant and when the injury was caused by an act done in the course of the relationship, the place where the relationship is centered is another contact to be considered." Restatement (Second) of Conflict of Laws § 145 cmt. e (1971); see also Foster v. United States, 768 F.2d 1278 (11th Cir. 1985) (noting that the relationship between the parties should be narrowly defined). The plaintiff purchased the Implant Product from the defendant who is located in Florida. Dr. Cohen's affidavit does not disclose the logistics of how the plaintiff purchased the Implant Product, e.g. through a website, a sales call initiated by

---

[13] In its memorandum of law in support of class certification, the plaintiff asserted that the defendant's marketing and distribution efforts appeared to have been based in Florida. The defendant does not refute this assertion in its response. Therefore, the undersigned will presume that this fact is correct for purposes of this Report and Recommendation.

[14] See Biomet's Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification (DE# 77 at 20, 1/14/08) (asserting that the marketing materials were received by the plaintiff in Missouri). The plaintiff did not dispute this assertion.

the defendant from Florida, an in-office visit by a sales person, etc.[15] It merely attests to

the following:

> All of my orders for the [Implant Product] were sent to Garden City, Florida
> where to my knowledge they were filled by [the defendant] in Florida.
> Each of my transactions with [the defendant] were directed to people at
> [the defendant's] facilities in Florida and all of the [Implant Products] I
> received from [the defendant] were shipped to me from Florida by [the
> defendant].

See Affidavit of Dr. Cohen (DE# 61, Exhibit 1 at ¶ 12,12/7/07). The defendant argues,

and the plaintiff does not specifically refute, that: "[the plaintiff] purchased the implants

in Missouri, received the ostensibly offending marketing materials there . . .  and

complained to the president of Biomet about the effectiveness of the implants there."

See Biomet's Memorandum of Law in Opposition to Plaintiff's Motion for Class

Certification (DE# 77 at 20, 1/14/08). Thus, it appears that the relationship between the

plaintiff and the defendant is not centered in a single state. It is at least partially

centered in Missouri and partially centered in Florida.

Having considered the factors of section 145, the undersigned must now

consider the factors set forth in section 6 of the Restatement (Second) of Conflict of

Laws. The Eleventh Circuit warned that:

> [the court] cannot simply add up the factors delineated in section 145(2)

---

[15] There is some evidence to suggest that at least some putative class members purchased the Implant Product as a result of an in-office visit by one of the defendant's sales representatives. Although there was no set sales protocol, see Declaration of David Josza (DE# 77, Exhibit C, 1/14/08), one of the defendant's former sales representatives, Bryan Moeslein, testified at deposition that as to certain dental professionals he would: "make the appointment . . . usually get just in their lunch room or in their office and essentially show them the implant, show them the features and the benefits of the implant and explain those to them  . . . and then give them any supporting marketing materials that I had with me." See Deposition of Bryan Moeslein (DE# 77, Exhibit H at 12, 1/14/08).

and then apply the law of the sovereign with the greatest numerical total. .
. . Rather, [the court] must, as mandated by section 145(1), turn to the
factors delineated in section 6 to determine which sovereign has the most
significant contact.

Judge v. Am. Motors Corp., 908 F. 2d 1565, 1569 (11th Cir. 1990) (internal citations

omitted).

The principles stated in section 6 are as follows:

(1) A court, subject to constitutional restrictions, will follow a statutory
directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of
the applicable rule of law include

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative
interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be
applied.

Restatement (Second) of Conflict of Laws § 6(2). "The importance of these factors

varies depending on the nature of the issue that underlies the conflict of laws." Piamba

Cortes, 177 F.3d at 1299.

The first factor to consider is the needs of the interstate and international

systems. This factor seeks "to further and to facilitate commercial intercourse between

them." Restatement (Second) of Conflict of Laws § 6 cmt. d. Neither party has

presented any arguments suggesting which law is favored by this factor. The

undersigned finds that this factor is neutral.

The second, third, and fifth factors require a comparison of each interested

state's policies and interests underlying the issues to be decided. The second and third factors consider "the relevant policies of the forum" and "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue," respectively. The commentary notes that "[i]n general, it is fitting that the state whose interests are most deeply affected should have its local laws applied." Restatement (Second) of Conflict of Laws § 6 cmt. f (1971). The fifth factor is the basic policies underlying the particular field of law. It requires consideration of which state's law "will best achieve the basic policy, or policies, underlying the particular field of law involved" in the dispute. Restatement (Second) of Conflict of Laws § 6 cmt. h.

As noted above, one of the stated purposes of FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202 (2). Missouri's unfair trade statute is the Missouri Merchandising Practices Act,  Mo. Rev. Stat. § 407.010 et seq., (hereinafter "MMPA"). "The purpose of the MMPA is 'to preserve fundamental honesty, fair play and right dealings in public transactions.'" Ullrich v. CADCO, Inc., 244 S.W.3d 772, 777-78 (Mo. App. 2008) (Schuchmann v. Air Services Heating & Air Conditioning, Inc., 199 S.W.3d 228, 233 (Mo. App. 2006)). Both statutes have similar policies.

The plaintiff argues that Florida has an interest in protecting individuals who do business with Florida corporations. However, with respect to the plaintiff's claim, Missouri also has an interest in protecting its citizens from deceptive and unfair trade practices particularly when the injury occurred within its borders. See In re Ford Motor Co. Ignition Switch Products Liab. Litig., 174 F.R.D. 332, 348 (D. N.J. 1997) (noting that

21

"[e]ach plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws."). In the instant case, Missouri's policy interest would carry greater weight than Florida's corresponding interest because the injury occurred in Missouri and arose from a relationship that was partly centered in Missouri.[16] The plaintiff is a Missouri resident, all of the plaintiff's damages occurred in Missouri and part of the defendant's wrongful conduct (providing the plaintiff with offending marketing materials and an unmerchantable product) occurred in Missouri. The plaintiff has not shown why Florida would have a greater interest and concern than Missouri for the protection of a Missouri resident who was injured in Missouri as a result of wrongful conduct that occurred, in part, in Missouri arising out of a relationship that was partly centered in Missouri. Under the facts of the instant case, the section 6(2)(b), (c) and (e) factors weigh in favor of applying Missouri law.

The fourth and sixth factors favor Florida law. The fourth factor seeks to protect the parties' justified expectations. The sixth factor requires the Court to consider the certainty, predictability and uniformity of result. "Predictability and uniformity of result are of particular importance in areas where the parties are likely to give advance thought to the legal consequences of their transactions." Restatement (Second) of Conflict of Laws § 6 cmt. i (1971). As the plaintiff points out, the defendant chose Florida law to govern its warranty program. The 3i Five Year Warranty Program states that "[it] is governed by the laws of Florida without regard to conflict of laws principles."

---

[16] Although Missouri's MMPA may, or may not, apply to the plaintiff's unfair trade practice claim, Missouri has the right to delineate other legal remedies to protect the plaintiff.

22

3i Five Year Warranty Program (DE# 65 at Exhibit 1, 12/10/07). Although the plaintiff's unfair trade practice claim is not premised on the defendant's Five Year Warranty Program, the Court may consider the choice of law provision in the defendant's warranty program in its conflict of laws analysis. See Renaissance Cruises, Inc. v. Glassman, 738 So. 2d 436 (Fla. 4th DCA 1999) (court considered the forum selection clause on passenger ticket as favoring the application of Florida law under a conflict of laws analysis for claim that was not based on passenger ticket).

The last factor is the ease in the determination and application of the law to be applied. This factor slightly favors the application of Florida law. See Pycsa Panama S.A. v. Tensar Earth Technologies, Inc., No. 06-20624, 2008 WL 1775409, at *28 (S.D. Fla. Apr. 16, 2008) (noting that the district court, often sitting in diversity, had experience researching, analyzing and applying Florida law). However, researching, analyzing and applying Missouri law would not be particularly difficult. This factor is likely to play a more important role where the law of the interested state is not easily ascertainable, such as in the case of a foreign sovereign. Under the facts of the instant case, the slight ease in applying Florida law would not be significant enough to outweigh any of the other factors.

Based on the foregoing analysis, the undersigned concludes that Missouri has the most significant relationship to the plaintiff's unfair trade practice claim. Although the Implant Product was, for the most part, manufactured in Florida and, presumably, the offending marketing materials were based in Florida, the plaintiff received the marketing materials and the Implant Product in its home state of Missouri. It is undisputed that the plaintiff was injured in Missouri. The Implant Product failed in Missouri causing the

23

plaintiff economic injury in Missouri, however, the Court will not accord significant weight to the place of injury in the instant case. Additionally, although the protection of justified expectations and the certainty, predictability and uniformity of result favor the application of Florida law, they are not sufficient to overcome the more important considerations of the second, third and fifth factors of section 6(2) in the instant case.

Because Missouri, and not Florida, has the most significant relationship to the plaintiff's unfair trade practice claim, the plaintiff does not have standing to assert a FDUTPA claim on behalf of each putative class member. See Montgomery v. New Piper Aircraft, Inc., 209 F.R.D. 221, 225-26 (S.D. Fla. 2002) (finding that plaintiff lacked standing to bring an action under FDUTPA where his claim was more appropriately brought under Texas' deceptive trade practice act). As such, the plaintiff has not satisfied the typicality requirement with respect to its unfair trade practice claim.

 The plaintiff cites to Renaissance Cruises, Inc. v. Glassman, 738 So. 2d 436 (Fla. 4th DCA 1999) in support of its argument that Florida law (FDUTPA) should apply to the plaintiff's claim and the claims of all putative class members. In Renaissance, passengers brought a FDUTPA claim against a cruise line for collecting port charges from passengers and keeping the difference between the actual port charges and the amounts paid by the passengers. The trial court applied FDUTPA to the nationwide class action even though most of the class members were not Florida residents and did not purchase their tickets in Florida. Id. at 437. In affirming the trial court, the appellate held that "Florida clearly ha[d] a significant contact with the claim of overpayment of port charges made by each claimant. There is nothing arbitrary nor fundamentally unfair in applying the law of Florida to all of the members of the class." Id. at 439. The

24

appellate court noted the trial court had supported its finding with the following Florida

contacts:

> [The cruise line's] principal place of business is in Florida, and thousands of Florida plaintiffs have been allegedly harmed by [the cruise line's] port charge practice. For the most part, [the cruise line's] U.S. business operations are controlled and carried out from Broward County[, Florida] where payment for the cruises was made. The port charges generally were paid to the various foreign ports through checks issued out of Fort Lauderdale[, Florida]. Therefore, any overages were kept by [the cruise line] in Fort Lauderdale. The cruise ticket contract and marketing information originated in Broward county and bore appellant's Fort Lauderdale address. Moreover, the tickets provided that Broward County courts would have jurisdiction over disputes. This is indicative of the parties' mutual expectation that Florida law would apply to the transaction.

Id. at 439.

The undersigned finds that Renaissance is distinguishable from the instant case

because in Renaissance both the offending conduct and the injury[17] took place in

Florida. This is an important distinction. See Restatement (Second) of Conflict of Laws

§ 145 cmt. e (1971) (noting that "[w]hen the injury occurred in a single, clearly

ascertainable state and when the conduct which caused the injury also occurred there,

the state will usually be the state of the applicable law with respect to most issues

involving the tort."). Here, the parties agree that the injury occurred in the plaintiff's

home state of Missouri. Additionally, some of the offending conduct occurred in

Missouri. The defendant submitted the offending marketing materials to the plaintiff in

Missouri and shipped the Implant Product to that state where the product subsequently

failed. See Hutson v. Rexall Sundown, Inc., 837 So. 2d 1090, 1094 (Fla. 4th DCA 2003)

---

[17] "The [trial] court . . . found that since all payments for the cruise were made to [the cruise line] in Florida, class adjudication was superior to individual actions in **that the common injury occurred in Florida**." Renaissance, 738 So. 2d at 438 (emphasis added).

(affirming trial court's conclusion that "the claims of non-resident consumers would require the application of consumer protection laws from each of the states where the deceptive trade practice occurred and the non-resident claimants suffered injury.").

  **D.**  **Adequacy**

  Rule 23(a)(4) '"encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representative[ ] and the class; and (2) whether the representative[ ] will adequately prosecute the action.'" Valley Drug Co. v. Geneva Pharm., Inc., 350 F.3d 1181, 1189 (11th Cir. 2003) (quoting In re HealthSouth Corp. Sec. Litig., 213 F.R.D. 447, 460-461 (N.D. Ala. 2003)). The named plaintiff does not have any apparent interests that conflict with potential members of the class. The plaintiff appears to be involved in the litigation, providing affidavits in support of class certification. The defendant does not question the qualifications, experience or ability of plaintiff's counsel. Plaintiff's counsel appears to be well equipped to prosecute this action. Nonetheless, the undersigned finds that the adequacy requirement is not satisfied here with respect to the FDUTPA claim because the plaintiff does not have standing to assert this claim, see discussion supra.

  Having carefully analyzed the Rule 23(a) requirements, the undersigned finds that with respect to the warranty claims, but for the deficient warranty class definitions, the plaintiff would have satisfied the numerosity, commonality, typicality and adequacy requirements. With respect to the FDUTPA claim, even if the plaintiff were to cure the defective FDUTPA class definition, the plaintiff has failed to satisfy the typicality and adequacy requirements because the plaintiff lacks standing to bring a FDUTPA claim.

3.      **Rule 23(b)(3) Requirements**

The plaintiff seeks class certification under Rule 23(b)(3). Rule 23(b)(3) provides

for the certification of a class where the prerequisites of Rule 23(a) are met and "the

court finds that the questions of law or fact common to class members predominate

over any questions affecting only individual members, and that a class action is superior

to other available methods fairly and efficiently adjudicating the controversy." Fed. R.

Civ. P. 23(b)(3).

> The Rule 23(b)(3) predominance inquiry tests whether proposed classes
> are sufficiently cohesive to warrant adjudication by representation. In
> order to determine whether common questions predominate, [a court is]
> called upon to examine the cause[ ] of action asserted in the complaint on
> behalf of the putative class. Whether an issue predominates can only be
> determined after considering what value the resolution of the class-wide
> issue will have in each class member's underlying cause of action. To
> qualify as a Rule 23(b)(3) class action, the issues in the class action that
> are subject to generalized proof, and thus applicable to the class as a
> whole, must predominate over the issues that are subject only to
> individualized proof. The predominance inquiry focuses on the legal or
> factual questions that qualify each class member's case as a genuine
> controversy and is far more demanding than Rule 23(a)'s commonality
> requirement. The most important consideration is the substantive law
> applicable to the case and the proof which will be necessary to establish
> the claim.

Hammett v. Am. Bankers Ins. Co., 203 F.R.D. 690, 698 (S.D. Fla. 2001) (internal

quotations and citations omitted).

A.      **Predominance**

i.      **Breach of Express Warranty**

In the instant case, the plaintiff asserts claims for breach of express and implied

warranties in Count I and II of the Complaint (DE# 93, 2/27/08). The plaintiff's breach of

express warranty claim is based on representations made in marketing materials. See

27

Affidavit of William M. Cohen (DE# 65 at Exhibit 1, ¶ 5, 12/10/07). The defendant

argues that conflict of laws determinations preclude class treatment of the plaintiff's

warranty claims. See Biomet's Memorandum of Law in Opposition to Plaintiff's Motion

for Class Certification (DE# 77 at 7, 1/14/08). "[I]ndividualized choice of law

determinations swamp any potential common questions and militate against class

treatment." See Biomet's Memorandum of Law in Opposition to Plaintiff's Motion for

Class Certification (DE# 77 at 7, 1/14/08). The defendant further argues that the plaintiff

did not attempt to satisfy its burden of showing the lack of conflicts between the various

states' warranty laws in its motion. Id. at 8.[18]

In its reply, the plaintiff limits the class definition for its breach of express

warranty claims to:

> all periodontists, oral surgeons, and similar medical-dental professionals
> (or, as applicable, their professional corporations or other corporate
> entities) in Alabama, Connecticut, Delaware, District of Columbia, Florida,
> Hawaii, Idaho, Indiana, Kansas, Louisiana, Maryland, Massachusetts,
> Michigan, Missouri, Montana, New York, North Carolina, North Dakota,
> Pennsylvania, South Carolina, South Dakota, Vermont, Virginia and West
> Virginia who purchased the Implant Product in the United states, received
> marketing materials about Implant Product's success rate, and have had
> to replace the Implant Product at a rate higher than warrantied within the
> applicable statute of limitations.

See Plaintiff's Reply Memorandum in Support of Motion for Class Certification (DE# 88

at 8-9, 2/5/08). According to the plaintiff, the laws in these states and the District of

Columbia do not require reliance.

The parties dispute which document or documents give rise to an express

warranty. The defendant argues that its only warranty was contained in the document

---

[18] An analysis of the states' warranty laws was included in plaintiff's initial reply,
which was stricken by the Court. See Footnote 2, supra.

28

entitled "3i Five Year Warranty Program." The Five Year Warranty Program contains a choice of law provision which states that Florida law applies to the warranty program. See 3i Five Year Warranty Program (DE# 65 at Exhibit 1, 12/10/07). The plaintiff counters that it never received the Five Year Warranty Program and the defendant's marketing materials created an express warranty concerning the failure rate of the Implant Product. Because the plaintiff's breach of express warranty claim is based on marketing materials, the Court will need to conduct a conflict of laws analysis. "Under Florida law, a court makes a separate choice of law determination with respect to each particular issue under consideration." Trumpet Vine Inv., N.V. v. Union Capital Partners I, Inc., 92 F.3d 1110, 1115 (11th Cir. 1996).

The plaintiff seeks to bring a breach of express warranty claim on behalf of putative class members residing in 22 states and the District of Columbia. The plaintiff seeks to apply Florida's UCC to the warranty claims of all putative class members. The burden of presenting a sufficient choice of law analysis lies with the plaintiff. In its initial memorandum of law the plaintiff failed to present any choice of law analysis for its breach of warranty claims. Having failed to brief the issue, the plaintiff attempted to include a survey of warranty laws in its initial reply. The plaintiff's initial reply was stricken because the Court found that the reply appeared to raise new arguments. Even if the undersigned were to consider the  warranty laws survey contained in the plaintiff's original reply, the undersigned finds that there are substantial differences between the warranty laws of the various states. Thus, a conflict of laws analysis is required.

Section 6(1) of the Restatement (Second) of Conflict of Laws, provides that "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own

29

state on choice of law." Restatement (Second) of Conflict of Laws § 6(1) (1971).
Florida's UCC provides that "this code applies to transactions bearing an appropriate
relation to this state." Fla. Stat. § 671.105(1). "Federal courts interpreting this phrase . .
. have taken into account the residence of the parties, the location of negotiations, the
place of purchase of the goods, and the physical location of the goods at issue."
Premix-Marblelite Mfg. Corp. v. SKW Chemicals, Inc., 145 F. Supp. 2d 1348, 1353-54
(S.D. Fla. 2001) (citing Hadar v. Concordia Yacht Builders, Inc., 886 F. Supp. 1082,
1093 (S.D. N.Y.1995)).

As noted above, the plaintiff resides in Missouri and the defendant in Florida.
The Court should also consider the place of negotiation. The record does not disclose
how the plaintiff purchased the Implant Product. One of the defendant's former sales
representatives, Bryan Moeslein, testified at deposition that at least with respect to
certain dental professionals, it was his practice to sell the product through in-office
visits. See Deposition of Bryan Moeslein (DE# 77, Exhibit H at 12, 1/14/08). If the
plaintiff purchased the Implant Product in a similar manner, then the place of
negotiation would likely have been Missouri. However, there is no record evidence
concerning how the plaintiff purchased the Implant Product.[19] Even if the plaintiff did not
purchase the Implant Product through an in-office visit, the plaintiff ordered the product
from his home state of Missouri. Thus, it appears that the negotiations partly took place
in Missouri.

The Court should also consider the place of purchase and the physical location

---

[19] It is unlikely that Mr. Moeslein sold the Implant Product to the plaintiff since Mr.
Moeslein's sales territory did not include Missouri.

of the goods. The Implant Product was manufactured, for the most part, in Florida, shipped from Florida to Missouri and received by the plaintiff in Missouri. Thus, the plaintiff purchased the Implant Product in Missouri and it was implanted in patients in Missouri. Additionally, the economic injury occurred in Missouri. See Premix-Marbletite, 145 F. Supp. 2d 1348, 1353-54 (S.D. Fla. 2001) (taking into account place of injury in conflict of laws analysis on breach of warranty claim). Taking these factors into account, Missouri law has an appropriate relation to the transactions at issue. As such, Missouri law should apply to the plaintiff's breach of express and implied warranty claims. Similarly, the law of the state of each putative class member would apply to his or her warranty claim. Because individual legal issues predominate, the plaintiff cannot satisfy the predominance requirement of Rule 23(b)(3).

Even if the undersigned were to conclude that Florida law applies to the claims of all putative class members, individual factual questions preclude a finding of predominance.

The parties do not agree on whether Florida requires reliance on a claim for breach of express warranty. The plaintiff argues that proof of reliance is not required. See Plaintiff's Reply Memorandum in Support of Motion for Class Certification (DE # 88 at 9, 2/5/08) (citing Southern Broad. Group, LLC v. Gem Broad., Inc., 145 F. Supp. 2d 1316, 1321 (M.D. Fla. 2001)). The defendant counters that justifiable reliance is an essential element of proof for a claim of breach of express warranty. See Biomet's Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification (DE# 77 at 13-14, 1/14/08) (citing, inter alia, Thursby v. Reynolds Metal Co., 466 So. 2d 245, 250 (Fla. 1st DCA 1984)). The Florida Supreme Court has not decided this issue.

31

The undersigned does not need to decide whether reliance is an essential element of a breach of express warranty claim in determining whether the plaintiff has satisfied the predominance requirement. Even if reliance is not required, individual factual issues would still predominate. Each putative class member would have to show that he or she was injured as a result of the defendant's breach of warranty. See Fla. Stat. § 672.313; Dunham-Bush, Inc. v. Thermo-Air Service, Inc., 351 So. 2d 351, 353 (Fla. 4th DCA 1977) (noting that in order to properly plead a cause of action for breach of express or implied warranty under Florida's UCC, a complaint should include allegations concerning the injuries sustained by the buyer as a result of the breach of warranty).

The notice requirement also creates individualized questions of fact. The buyer must notify the seller that the goods are nonconforming in order to recover damages for breach of either an express or implied warranty. The notice requirement is contained in Fla. Stat. § 672.607(3)(a) which provides that "[w]hen a tender has been accepted the buyer must within a reasonable time after he or she discovers or should have discovered any breach notify the seller of breach or be barred from any remedy. . . ." "[T]he burden is on the plaintiff to show that he gave the required notice within a reasonable time." Gen. Matters, Inc. v. Paramount Canning Co., 382 So. 2d 1262 (Fla. 2d DCA 1980). In the instant case, each putative class member would have to show that he or she gave the defendant notice within a reasonable time. What constitutes a reasonable time is a highly individualized factual determination for each putative class member and will depend on differing facts and circumstances. In the instant case, the putative class members purchased the Implant Product at different times and in varying

32

quantities. What is considered a reasonable time for one putative class member would not necessarily be considered reasonable for another. Thus, in determining reasonableness each putative class member's individual circumstances must be taken into account. The plaintiff argues that "the complaint serves as requisite notice by Plaintiff and the putative class of their warranty claims." However, the undersigned is not persuaded by the plaintiff's argument because it would obviate the need for the notice requirement. Based on the foregoing, the undersigned concludes that individual factual and legal questions predominate the plaintiff's breach of express warranty claim.

      **ii.**        **Breach of Implied Warranty**[20]

The plaintiff's breach of implied warranty claim is based on Florida's Uniform Commercial Code. See Complaint (DE# 93 at ¶ 28, 2/27/08). The plaintiff alleges that the defendant violated Florida's implied warranty of merchantability, Fla. Stat. § 672.314, because the Implant Product was not fit for the ordinary purpose for which dental implants are used and the Implant Product was not adequately contained, packaged or labeled. Id. at ¶ 29. The plaintiff further alleges that the defendant violated the implied warranty of fitness for a particular purpose, Fla. Stat. § 672.315, because the defendant had reason to know when it sold the Implant Product that it would be implanted into the jaws of patients and that dental health care providers would rely upon the defendant for its skill in furnishing suitable dental implants but that the Implant Product was not fit for implantation into the jaws of patients. Id. at ¶ 30.

---

[20] At the oral argument, the undersigned questioned the plaintiff's counsel on how he intended to satisfy Rule 23(b)(3) when the breach of implied warranty claim required reliance. The plaintiff's counsel advised the undersigned that he intended to proceed on the breach of express warranty claim but was not dismissing the implied warranty claim because he had not conducted sufficient discovery to remove the claim.

The parties agree that reliance is a necessary element of a breach of implied warranty claim. Here, each putative class member would have to show reliance on an individualized basis. They would also have to show notice, which would need to be determined on an individualized basis, <u>see</u> discussion supra.  Additionally, in order to establish liability, each putative class member would have to show that the implied breach of warranty was the proximate cause of the putative class members' loss. <u>See Borrell-Bigby Elec. Co., Inc. v. United Nations, Inc.</u>, 385 So. 2d 713, 715 (Fla. 2d DCA 1980) (reversing jury verdict for plaintiff on claim for breach of implied warranty where plaintiff could not show that defendant's breach was the proximate cause of plaintiff's loss). As noted above, the Implant Product could fail as a result of improper placement by the doctor or where the patient was not a candidate. Thus, each putative class member would have to show that the Implant Product they purchased failed as a result of a defect in the product. <u>See Amoroso v. Samuel Friedland Family Enterprises</u>, 604 So. 2d 827, 833 (Fla. 4th  DCA 1992) (noting that one of the elements required to prove liability under an implied warranty theory is that the defect caused the injury). Based on the foregoing, individual factual and legal issues predominate the breach of implied warranty claim.

      iii.        **FDUTPA**

As discussed above, the undersigned finds that FDUTPA would not apply to the claims of every class member under Florida's conflict of laws rules. The Court would have to make legal inquiries concerning the consumer protection laws of 49 states and the District of Columbia. As such, individualized legal questions predominate over common questions with respect to the plaintiff's FDUTPA claim.

34

Even if the Court were to apply FDUTPA to the claims of every class member, individualized questions of fact predominate precluding class certification. As the defendant points out, each putative class member would have to show that it received the sales brochures or other marketing materials in which the defendant's representation of a 2% failure rate was made. See Biomet's Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification (DE# 77 at 16-17, 1/14/08). In the instant case, the defendant did not provide its customers with a uniform set of marketing materials. "Each sales representative has a sales package for each product. The package includes information regarding the rationale for developing the product, the applications it's intended for, the purpose of the product, etc. However, there is no standard package of materials that is given to doctors during sales visits. . . . [T]he sales representative provides the doctor with brochures and documents regarding specific products based on the doctor's particular needs and interests. " See Declaration of David Josza (DE# 77, Exhibit C at ¶¶ 8, 10, 1/14/08). Thus, not every putative class member received the same marketing materials that the plaintiff received. Whether each putative class member received or was exposed to the defendant's marketing materials is an individualized question of fact in the instant case.

Causation also presents an individualized question. Each putative class member would have to prove causation in order to establish the defendant's liability under FDUTPA. See Rollins, Inc. v. Butland, 951 So. 2d 860, 869 (Fla. 2d DCA 2006) (noting that the elements of FDUTPA are (1) a deceptive act or unfair practice (2) causation and (3) actual damages). As noted in Montgomery, 209 F.R.D. at 229-230:

in order to prove liability under FDUTPA, the Court must determine that

35

(1) each putative class member was exposed to the Defendants' advertising and marketing materials alleged to constitute a deceptive trade practice and (2) if exposed, the advertising and marketing materials caused each putative class member damage. Such inquiries would result in a series of mini-trials for each putative class member on the issue of causation, which strongly militates against a finding of predominance.

In the instant case, the defendant has shown that the failure of the Implant Product could be due to a number of reasons including use of the Implant Product on a patient who was not a candidate and mistakes made by the doctor in inserting the Implant Product. Thus, to determine causation, the Court would have to engage in the same mini-trials contemplated in Montgomery.

The plaintiff argues that it does not have to show that each putative class member received the offending marketing material because its FDUTPA claim is also based on the defendant's omissions. "3i concealed from its clients that the NT Certain Implant was failing at an unacceptable level. Without this critical disclosure, 3i clients were unable to make educated judgments about whether to purchase the product." See Plaintiff's Reply Memorandum in Support of Motion for Class Certification (DE# 88 at 5, 2/5/08). The undersigned notes that the FDUTPA claim, as pled in the Complaint, does not allege that the defendants withheld or concealed information. Rather, it alleges that  "Defendant 3i violated [FDUTPA] by making deceptive representations and selling unmerchantable tools in connection with the conduct of trade or commerce." Complaint (DE# 93 at ¶ 33, 2/27/08) (emphasis added). "It is not the Court's role to amend the pleadings for the Plaintiff to articulate a claim that would meet the requirements of Rule 23 where the causes of action as presented do not." O'Neill v. The Home

Depot U.S.A., Inc., 243 F.R.D. 469, 481 (S.D. Fla. 2006).

To the extent that by "omissions," the plaintiff means that the defendant failed to advise customers that the Implant Product was unmerchantable, individual issues would still predominate because each putative class member must show causation. "In order for the consumer to be entitled to any relief under FDUTPA, the consumer must not only plead and prove that the conduct complained of was unfair and deceptive but the consumer must also plead and prove that he or she was aggrieved by the unfair and deceptive act." Macias v. HBC of Fla., Inc., 694 So. 2d 88, 90 (Fla. 3d DCA 1997); see also Marino v. Home Depot U.S.A., Inc., 245 F.R.D. 729 (S.D. Fla. 2007) (noting that causation was an element of FDUTPA in an action based on defendant's failure to disclose information). Thus, even if the plaintiff's FDUTPA claim is partially based on omissions by the defendant, individual fact questions would still predominate.

### B.    Superiority

The plaintiff argues that class treatment is superior to hundreds or thousands of individual actions which could yield inconsistent results. "Even if damage issues are ultimately tried individually, the efficiencies gained by use of a class action will ultimately benefit all of the class members and the defendant by a dramatic reduction in litigation expenses." See Memorandum of Law in Support of Plaintiff's Motion for Class Certification (DE# 61 at 17, 12/7/07). The defendant counters that a class action would not be manageable under the facts of the instant case because individualized analysis would have to occur as to each class member.

37

Because individual factual and legal issues predominate, a class action proceeding in the instant case would be unmanageable. Additionally, at least with respect to the FDUTPA claim, a class action is not the superior or only mechanism for resolving this claim. Individuals who have standing to bring a FDUTPA claim would not be deterred by the nominal value of their claims because FDUTPA allows a prevailing party to recover attorney's fees. See Marino v. Home Depot. U.S.A., Inc., 245 F.R.D. 729, 737 (noting that class action was not superior or only method of adjudication of FDUTPA claim because FDUTPA provides for attorney's fees). The undersigned concludes that a class action in the instant case would not be the superior method of adjudication.

In sum, the plaintiff cannot satisfy Rule 23(b)(3) with respect to either its warranty claims or FDUTPA claim. The undersigned finds that individualized issues of law predominate as to all claims because the Court would have to apply the laws of the various interested states. Additionally, with respect to the breach of express warranty claim, notice and a showing that the putative class member's injury was caused by the defendant's breach would have to be established on an individualized basis. With respect to the breach of implied warranty claim, each putative class member would have to show reliance. Individual factual determinations also predominate as to the FDUTPA claim because each putative class member would have to show that it received the marketing materials and that it was harmed as a result of the defendant's offending conduct. Because individual factual and legal issues predominate, the

38

plaintiff cannot show that a class action would be the superior method of adjudication. Additionally, with respect to the FDUTPA claim, putative class members would not be deterred from prosecuting even nominal claims because FDUTPA provides for an award of attorney's fees to the prevailing party.

## CONCLUSION

The plaintiff is not entitled to class certification on the warranty claims. The undersigned concludes that, had the plaintiff proposed workable warranty class definitions, the plaintiff would have satisfied the numerosity, commonality, typicality and adequacy requirements of Rule 23(a). Nonetheless, the plaintiff is not entitled to class certification of its warranty claims because the plaintiff failed to satisfy the requirements of Rule 23(b)(3).

With respect to the FDUTPA claim, even if the plaintiff were to cure the defective FDUTPA class definition, the plaintiff cannot satisfy the typicality and adequacy requirements of Rule 23(a) because the plaintiff lacks standing to bring a FDUTPA claim. Alternatively, if the Court were to conclude that the plaintiff has standing and a nationwide class action based on FDUTPA could be maintained, the plaintiff is not entitled to class certification of its FDUTPA claim because it cannot satisfy predominance under Rule 23(b)(3).

Based on the foregoing, the undersigned concludes that class certification is not warranted for either the warranty claims or the FDUTPA claim in the instant case.

## **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that Plaintiffs' Motion for Class Certification (DE# 60, 12/07/07) be **DENIED**.  Pursuant to 28 U.S.C. §636(b)(1)(B) and (C), the parties may serve and file written objections to this Report and Recommendation with the Honorable Joan A. Lenard, United States District Judge, within ten (10) days of receipt of a copy of this Report and Recommendation. See Nettles v. Wainwright, 677 F.2d 404 (5th Cir. 1982).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this **13th** day of June, 2008.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided:

United States District Judge Lenard
All counsel of record

40